The 2017 Act's quarterly fee increase presents a clear and obvious violation of the Bankruptcy Clause's uniformity requirement. Congress arbitrarily divided the country into two different groups and then authorized different fees for identically situated debtors because their distinct local conditions or industry-specific problems justifying this non-uniform treatment. The division is entirely artificial. There is nothing unique about North Carolina or Alabama that justifies a separate bankruptcy system with its own special lower fees. Congress has simply decided to treat the same class of debtors differently because their bankruptcies arose in, say, Virginia instead of North Carolina. The Constitution requires uniform bankruptcy laws, and a bifurcated system that imposes different charges on indistinguishable debtors is not uniform under any ordinary definition. Because the 2017 law is not uniform on its face, it violates the Constitution, and this Court should reverse. I welcome the Court's questions. Mr. Geiser, is the real problem here as to lack of uniformity the fees, the differential fees, or the original division of the country into two different types of districts? I think it's both, Your Honor. I think that Congress has artificially bifurcated the country into two different systems, and now it's charging debtors different fees based on that original bifurcation. Either way, though, Congress is treating an identically situated debtor class, debtors that look alike in every material respect. There's nothing about them that justifies different treatment, and yet they're paying more for their bankruptcies based entirely on where they happen to file. But wouldn't you have a problem if you accept the fact that if you say that the division is legitimate, then it would seem to follow that the differential fees would be based on geography? Well, no, Your Honor, because, again, the original division is, in fact, based on geography, and Section 581 makes this clear. The trusteeship is divided into 48 states, and then there are two holdout districts for Alabama and North Carolina, and there's really no way to cut it other than a geographic distinction. There's no reason that Congress would treat debtors who look exactly the same, who are electronic retailers, any differently because their bankruptcy is in Virginia as opposed to somewhere else. But I think one answer, ready answer, is, well, they're treating them differently because they're different systems. Now, that only makes sense if there's a reason that they're different systems, and I have not been able to figure out what that reason is. What's that reason? Why are there two different systems? There is no reason, Your Honor. It's entirely arbitrary. I know, but there must be some reason it happened. I mean, they just didn't pull out the map and suddenly say, let's pick out two states and have a whole separate system. And if there's a reason for it, then I think it's a very strong case on the other side that, well, the fees in one can be one and the fees in the other can be different, and it's because there's a reason to have two different systems. So what is it? The only reason that we've seen, Your Honor, is politics and local preferences. What do you mean politics? The bankruptcy judges and the bankruptcy bar in North Carolina and Alabama liked the system the way it was, so they lobbied their congressmen, who included exceptions in the statute for those two states. The General Accounting Office looked at this in 1992 and said, there is no reason to have two different systems. In fact, and the government has conceded in the lower courts, there's nothing unique about the bankruptcy system in North Carolina or Alabama that justifies having different bankruptcy laws for those two states alone. So it's just because the bankruptcy judges didn't want to change? The bankruptcy judges in that case, I guess, liked it the way it was, and they didn't want to be part of the U.S. trustee system. But that, of course, is not a legitimate, relevant material distinction. Every time this court is asked, is there a relevant basis for drawing lines based on geography, which, by the way, is exactly what the Bankruptcy Clause says that Congress can't do. It says that has to be uniform laws throughout the United States, and this is clearly not uniform throughout the United States. It's a procedural matter. Suppose that, you know, some states or bankruptcy judges somewhere say, you know, we want to start court at 11. We want to start at 11. We think it works better that way. We're refreshed. Okay. So other states say no, 9. And Congress passes a law saying 10, but we'll keep 11 for the two states. All right. Why can't they try out different things? They like it the way they're doing it. I mean, it works. It's not a substantive law. It's just the way we work it. Now, can't we give, isn't it uniform to give certain matters, states and districts their choice? Well, Your Honor, no, it's not. First, there is a way to do that in a uniform manner, but it is not uniform to say that two states get the choice to start at 11, but the other 48 states get no choice. They have to start at 9, or they have to start at some other time. If Congress said that any state has the option to decide when court starts, that's a uniform law. It's against the law of the Constitution to say on procedural matters, states get their choice. And it is against the law to say some states get their choice, but others don't. And the reason is because the states that get their choice have a system which has led them to ask us, because they feel very strongly about using it one way or the other. It's not a valid reason. I don't know. Maybe it is. Maybe it isn't. What do you think? I don't think it is a valid reason, Your Honor, precisely because the Constitution constrains the top-down choices that Congress makes, and that they have to be uniform choices. Well, surely they can make different choices on something, right? You know, one district decides they're going to buy, you know, computers from computer company A, and another says, no, we're going to buy it from B, right? So they can have differences to some respect. Well, again, Your Honor, I think it depends on where are those differences being introduced. Are they being introduced by Congress, where Congress is saying that some states have to buy from company A as opposed to company B? Or if Congress says any district can buy computers wherever they'd like? I don't know which, I'm sorry. Which one is good and which one is bad? The one where Congress is setting the same rules, standard, choice framework for every district in every state in the country. That avoids the concerns of regionalism. Then any regional difference is introduced at a local level. But then even under the Chief Justice's hypothetical in the computer-buying program, if it's in the statute itself, that'd be a violation of the uniformity clause? That may not be a law on the subject of bankruptcies, Your Honor, so it may be exempted on that basis. Okay, and that gets to the point, how do you define the subject of bankruptcies, which goes to, I think, Justice Breyer's question as well. Well, I think it does, but I think here we have something that is very clearly on the subject of bankruptcies. Now, this Court has said it's very hard to define, but the Court has also said that Congress's power extends to the entire subject of bankruptcies. And here we're talking about a statute that is called bankruptcy fees. It applies in bankruptcy cases. It's for the bankruptcy trustee to do bankruptcy tasks. It specifically allocates the debtor's resources in the bankruptcy estate to trustee fees as opposed to creditors or back to the debtor itself. But it's not about bankruptcies. It's not like you have a different rule of priority in discharging debts, right? I mean, could they have a rule? I mean, things are more expensive in New York than they are in North Carolina. So they say you can charge fees up to $200,000 a quarter in New York, but only $50,000 a quarter in North Carolina? Well, Your Honor, I think what they can do is say you can charge market rates. And that's legitimate for two reasons. First, it's a uniform law. Every state can charge a market rate. That's the same standard. There's no danger there that the framers would have been concerned about, about Congress favoring certain states or certain regions over others because everyone has the same framework. The debtor, in that example, would be paying, the debtors would be paying different rates depending on where they were, just as now. So why is that better? Well, it's different, and it's different in a very profound and important way. It's different because those are different effects. Now, the Constitution in its text says there have to be uniform laws. It doesn't say the effects have to be the same. And that's why this court in the Moises decision said there's no problem with saying states can create their own exemptions. Every state can craft whatever exemptions it wants. That's fine. Any deviation is introduced at the local level. It's not introduced, again, top down, where Congress is dictating a specific rule for some regions but not others. In this case, did they have, before I, I'm just finishing up with the Chief, was there any evidence that any of the 48 states that have the trustee system said to Congress in any way, we want to have the other system. We want the freedom to choose. I think the answer is going to be no. And I think it's pretty tough to say. My thought was if the answer is no, I'm giving you time to think whether the answer is no, but if the answer is no, there isn't really much difference, which I can't see it, between a system which says you two states get this old system because you're the only ones who asked for it. That seems logical. But you now can answer yes or no, if you remember the question. Well, I do remember the question. I'm not aware of any evidence either way, Justice Breyer, but I think the important thing is if Congress is concerned that some states may want to opt out or opt in, then Congress can say any state can choose. The districts in any state can decide to opt in or out of the trustee system. And then they'd have a uniform law. Any variation comes at the local level. Can I take you back to Justice Thomas's first question? Because Justice Thomas said, let's just presume that the original act here, the separation of these two states is constitutional. And I realize you have arguments that it's not, but let's just presume it is. At that point, doesn't this have to be constitutional as well? Because isn't this second differentiation, if you will, just really responding in a sensible way to the effects of the first differentiation? In other words, at that point, it's not arbitrary and it's not solely geographic. It's saying, you know what, these two states are not in the same financial position as the other 48 states are. They aren't self-financing, so they don't need these higher fees. Wouldn't that be a completely rational, appropriate thing for Congress to do if the original differentiation was okay? I don't think so, Your Honor. I think for a few different reasons. One is that even if the underlying system is somehow legitimate, it's perfectly fine for Congress to have these different systems for different states. There's still no reason that Congress has to impose fees and make the U.S. trustee program alone self-funding. There's nothing inherent about the trustee program that requires self-funding. That's a separate and subsequent policy choice. So Congress took the identically situated debtors who happened to be in that program and said, you pay for your bankruptcies, while the favored debtors over here in these two states, the taxpayers will fund the identical tasks. I thought that the question of whether it was self-funding, that that's part of the system where there was an appropriation, and the 48 were walking into a system where there wasn't an appropriation and that they needed to be self-funding. So that's part of the original differentiation, and now as part of the second level, it's like, oh gosh, this self-funding thing didn't work out so well. Not enough money is walking in the door. We have to increase the fees. Well, Your Honor, again, that might have been part of an original calculus, but that is its own policy decision at the congressional level to treat identically situated debtors who look exactly the same. I'm going to arbitrarily assign you to this group, other debtors to this group, and depending solely on geography, where they happen to file for bankruptcy, some are better off than others. This court has never approved that in any case. It's always looked for material relevance. But then you're saying we really have to address the first question of whether the original 48-2 differentiation was permissible, because it was in that original differentiation that the two separate funding systems were set up, wasn't it? Well, it was, Your Honor, but I think it was also then struck down, or at least the United Circuit purported to strike it down, precisely because it's not the same. And just to be very clear, and my friend might correct me soon, but in the government's brief, the only justification they offer for the dual system, to say why this is possibly legitimate, is it is effectively a single system that has different labels. It performs the same tasks. It's doing the same things. The debtors can't tell the difference. But the problem is once Congress layers on top of that system differential fees, then there is a material distinction, and debtors then are worse off based entirely on geography. So I don't think even if the underlying system is somehow legitimate in some world where there's a uniformity provision in the bankruptcy clause that says Congress can't have different bankruptcy laws for different parts of the country, I think the government's own defense breaks down immediately once they attach different fees to the different districts. Mr. Geiser, I'd like to take you back to Justice Kavanaugh's point about the scope of the bankruptcy clause, because I think it's important to the scope of your argument. You know, if the bankruptcy clause itself, augmented by the Necessary and Proper Clause, could be pretty broad, and I understand your argument to be the more specific controls, and so Congress can't circumvent the uniformity limitation on its bankruptcy power by relying on, say, the commerce power, its power over inferior tribunals. If that's pretty broad, doesn't this uniformity restriction become pretty significant? You know, think of the Chief's hypothetical about different computer purchasing? Well, it doesn't, Your Honor. First, it's not just our distinction. This is the Gibbons decision makes the argument for us, and says that Congress can't look to a different power in order to override the affirmative restriction in the bankruptcy clause. But I don't think this is putting that much of a restriction on what Congress can or can't do, and I think the proof of it is the government can't identify a single law other than the 2017 fee increase and the creation of the dual system in the first place that falls under our understanding of the bankruptcy clause. Congress just has to legislate uniformly. It just has to give every district the same rights. It has to have the same standards and framework and all of that. Then there's no danger of regionalism, which is what prompted the uniformity provision in the Constitution in the first place. The states were ceding power to the federal government and they didn't want a situation where the federal government would turn around and favor certain regions over others. If Congress simply passes a uniform law and gives every state the same choice and the same options, there's no danger of favoritism. Congress passes a law and it says in states one through ten, the bankruptcy judges will meet in the same courthouse as the federal district judges. In ten other states, it says they're going to meet in different courthouses, and in several other states, it says it's up to the chief judge of the federal district court. Okay? Non-uniform. It can't do that? Again, Your Honor, I think if Congress wanted to do that, it could very easily rewrite the law to say that every state gets the option. Now, they don't want to give every state the option. In certain places, Congress decides that it's a very helpful thing to the likely litigants to meet in the same courthouse. I just want to know that's their decision, and they think in other states the opposite is true. I understand that. In some states, they think it doesn't matter. So that's what they enact. In other words, they give a choice, and it seems that it doesn't. Well, there we are. What do you think of that? I think it's a non-uniform choice. Non-uniform. Okay, so now we're going to have to go street by street. I mean, I don't know the implications of your argument. What's the furthest you've ever found in any case which says this is too non-uniform, it violates the clause? Well, First Your Honor, I just want to be very clear. The law that you're talking about may or may not be the law on the subject of bankruptcies, if it's just simply saying that where judges happen to meet, whether it involves bankruptcy or not, or something like that. I understand. My example is not perfect. What I'd like to know is what case have you found that in your opinion goes the farthest in saying something is non-uniform in the bankruptcy area and therefore unconstitutional? Well, this Court has only admittedly struck down one law for being in violation of the uniformity provision. That's because Congress normally doesn't create different bankruptcy systems for different parts of the country. The law in which we struck it down, the non-uniformity, was what? It was a law that singled out a certain railroad for special treatment. Now, but the important thing is the Court's rationale in doing that, unlike what my friend says, was not that it was like a bill of attainder. Congress looked and said that there are similarly situated debtors that look the same in every relevant respect who are not covered by this exception for this single railroad, and said Congress can't do that. And if you look to that case and the Gibbons case and then Pazinski, which is in the tax context, but this Court has said that you look at the uniformity provisions in a similar way. This Court always asks, is there a material relevant distinction that justifies Congress dividing lines between debtors? And we're not saying there aren't hard cases and there aren't going to be some questions that push the edges of what falls within the subject of bankruptcy or what might be uniform or not, but this is a very easy one. This is, again, a bankruptcy fee. It's dividing up the bankruptcy estate. Money is going to the trustee instead of creditors based on an act of Congress that is saying debtors who file bankruptcy in two states and only two states must pay this fee, while the debtors in the 48 states must pay it, while the debtors in two have the option of paying it or not. What exactly was the concern at the time of the framing that led the framers to put this clause in the Constitution? The Court in Gibbons noted that there was very meager discussion of why this was placed in there, but the Court in Gibbons and in Pazinski, looking again at both the tax context and at the bankruptcy context and comparing the two, said one concern is regionalism. It's the concern that Congress can treat different regions of the country in different ways and can give favorable treatment to some states and not others. And that's exactly the type of concern that could arise with a law like that. Was there an actual particular episode or was there a particular concern? Was one region of the country more likely to have a bunch of people going bankrupt as opposed to another? No, Your Honor. And again, the bankruptcy clause sort of stands out for the lack of discussion. The way the Fifth Circuit framed it is it's sort of ironic that something that was so uncontroversial at the time now is pretty straight controversy because there's so little commentary about what it meant. But I do think the clause is clear on its face. A uniform law throughout the United States can't possibly mean a system where two states have differential treatment and 48 states have a different rule. Counsel, I'm having a difficulty because you're trying to establish a broad rule in a situation that I don't think lends itself to it given our case law. So we know regional differences can exist and you accept that. You accept that if Congress permits the 50 states to set their own fees based on their own needs, that's okay. Correct? That's correct. And we've also said that where Congress enacts geographically limited laws when responding to a geographically limited problem, that's okay too. That was the Railroad Reorganization Act, correct? That's right. So we don't want to announce a rule that says your laws have to be uniform all the time because there may be some rational basis to create a difference, correct? That's right, Your Honor. All right. Now let me stop. I think where the problem is here, and I understand the gut feeling, okay? The gut feeling is what you shouldn't be able to do is to say this state is going to let the taxpayers pay for something and the other 48 states don't have that choice. That's your problem, isn't it? It's that problem plus the arbitrariness of the initial division. I understand, but you see what my problem with that is, that I don't see why Congress can't say. You can have different systems in some places with respect to others where it's not the taxpayers' pay. If the system stands and we just strike down the fee difference, then I don't see why we couldn't keep this going on forever. And I think you debatably could. And just to be very clear, we do think that the original division is unconstitutional because it is non-uniform. Now, I'm not sure the original division, absent fees, creates any Article III injury for any debtor because the programs are so similar. But once you attach the fee on top of it, now you have identically situated debtors that look exactly the same who are being prejudiced because they filed bankruptcy in one of 48 states. You see, I just don't want to write a decision that says Congress couldn't do what it did here, which is to have eight states experiment with this different system to see if it worked or not, and then decide it's a better system than we have and create it generally and let some people keep the old system. What I have a problem with is creating a system permanently that lets the taxpayers assume costs for two states but don't give the other 48 a choice. And I think you could write a narrow decision that addresses the current situation that leaves aside whether Congress does have any freedom to experiment in this area. May I ask you one final question, which is, you assume that we have to level up and give you the choice of paying less money, but I don't know what constitutionally in our case requires us to give you that remedy. Meaning, we've also said that if Congress, if we think Congress wants us to level down, we should. And here Congress has given us a clear indication it wants leveling down. It's told the court system you have to level down. You have to raise the fee. Correct? No, Your Honor. And just to be very clear about this, I think Congress has indicated the opposite. When Congress changed the word may to shall to ensure going forward that there will be uniform treatment, which shows how easy it is for Congress to have not done this in the first place, Congress made that change prospective only. Congress was aware of the constitutional challenges. There were courts that had already struck down the 2017 Act as unconstitutional. Congress could have said, ah, this always should have been that way. Everyone who hasn't paid now needs to pay. They made the opposite determination. Oh, I'm sorry. I want to make sure you're finished, but Congress was operating at that point under the understanding of what the judicial conference had done, though, which was to raise the fees in those other districts. Raise the fees, but prospectively only, which raised fees and says in the text of the statute, right, that this confirms the longstanding intention of Congress that the quarterly fee requirements remain consistent, and that's at the time when the judicial conference has already acted. Correct? Already acted, but again, just to be very clear, and said that any case going forward that's filed after the Judicial Conference Act. So any debtor in the two states that didn't have to pay increased fees for that entire period. Just on this remedy point, more generally, what are we to make of that this seems to have been a mistake, right? So starting when the standing order went into place, the fees were the same, right? And then the new act in 2017 elevates the fees and the districts that are subject to the standing order of the Judicial Conference kind of late to the game. And then that's corrected, what, nine months later. And then Congress comes in and says, yeah, that's right. I mean, that seems a strange situation if we take our case law on looking for what Congress would have intended. If we take that, it seems a strange case to order refunds rather than to require additional payments. I don't think so, Your Honor. To be very clear, it wasn't a mistake. Congress chose the word May when it added A7. May I finish? Sure. Congress chose the word May. This is directed to the Judicial Conference. That was the audience of A7. And the Judicial Conference understood from the start it had discretionary authority to act or not. It reminded Congress of this periodically, including in 2007 when Congress tinkered with the fees. They said, we will likely match the fees. Maybe I'm cutting into my next time. Sorry. After the Ninth Circuit decision, though, this all gets fixed through a combination of actions. Fixed, you might dispute. But it becomes even the fees that are going to be paid in the various districts. No. And just to be very clear, when the Ninth Circuit acted, there were no fees in the bankruptcy administrative districts. The Congress's so-called fix was to create a non-uniform system again that said that in the 48 states the fees are mandatory. In the two states, it's entirely discretionary. And it's unclear why Congress did that. They shouldn't have. But the word May doesn't mean shall, especially in a statute that contrasts the two. Just in, am I correct, in 2001, the Judicial Conference issued a standing order saying that the fees shall be the same? They did. And it was also clear that Okay. From 2001 to 2018, they're the same. They were the same. But again And then in 2017, Congress had passed a new law raising them, but those other districts were kind of, like I said before, behind. And it didn't get changed until the third quarter of 2018. I think two key points, though. The first is that in 2007, the Judicial Conference told Congress, when Congress was tinkering with the fees a little bit, that it would likely match them. So Congress knew, and the Judicial Conference told Congress, that they have discretion and they may or may not act consistent with the way they've acted in the past. And in 2017, this was such a drastic increase in fees. This is the first time the Judicial Conference would say, wait a minute, maybe we should exercise our discretion and depart from past practice of making the fees equal. Congress in 2020 had to take away that discretion to ensure uniformity going forward, which is what they should have done in 2017, but didn't. Thank you, Counselor. Justice Thomas, Justice Breyer, anything further? What legal standard do you think governs this issue of leveling up or leveling down, as Justice Sotomayor put it? I think that there are two ways to look at it. One is that you first have to ask, are you equalizing the treatment in the relevant period? And so you have to find a viable option that could actually, looking backward, make sure that the same debtors were paying the same fees as their counterparts in other districts. Then from that point, if you've identified a viable option, then it is, what would Congress likely want to do? The problem here is that Congress, looking back, has to say, we need to unscramble the egg of three-plus years of possibly closed bankruptcies and track down the creditors and professionals and administrators in hundreds of bankruptcies to figure out a way to claw back the funds, assuming that's even constitutionally permissible. So if Congress doesn't have that as a viable option, then the only choice is to actually give the favor treatment to the people who were charged too much. Okay, so that is your argument. You think it's what Congress would likely do. There's another argument. There's the argument that you challenged the fee that was assessed against you, and therefore, if that's unconstitutional, you win. End of the game. You don't have to get into what Congress intended. But that's not your argument. I wish that could be our argument. We would love just to have the automatic right to fees, but I do think, consistent with this court's cases, if there is a way to equalize the treatment, because our constitutional injury isn't necessarily just that we paid a high fee. It's that we paid a non-uniform fee. So the remedy just has to correct the uniformity. The problem is the government doesn't have a viable option that's anything other than giving us back the money. Justice Sotomayor, any further? No, thank you. Well, this idea that Congress doesn't have a viable option, do we have to think about that through Congress's eyes, or is that a question for us? In other words, is there a viable option? If there's not a viable option, we can't tell anybody to claw back the fees because it's not going to happen, and then the inequality won't be remedied. So is that a what would Congress have done question, or is that a question of what you described as the first stage of the analysis? I think they overlap a little bit in the sense that this court first has to ask, is this something that can actually be done? Is this a permissible choice from a legal standpoint? Because if this would create, for example, a due process problem by having these drastic impositions on absolutely completed conduct, where everyone relied on not having to pay these fees and deciding how to structure a basic bankruptcy plan, then that's not even the choice that Congress can make, and that's a determination this court can do. Assuming the court thinks it is a viable option, the court can still... A viable option legally. Legally, exactly. Then the court can take into account, though, is this such a mess that it is implausible that any rational legislator would choose this? But again, I think this is easy here for the court because Congress looked at this problem in 2020 and decided to impose the increase prospectively. As I understand some of our tax cases, and some of our tax cases where we've had this kind of, should we level up, should we level down question, we've basically just said, let the government decide which one it wants to do. So why isn't that an appropriate analog? I think most of this court's tax cases involved state taxes, and so there was an element of federalism in not having the federal court dictate for the state government what it would do or wouldn't do. Here we actually have, we're in the federal system itself, so I think the court can be a little more assertive in looking and saying what would Congress do and what's permissible to do. But even in the state context, the court does ask, is there a viable option to equalize treatment looking backwards? And if there isn't, then the state doesn't have the choice, they simply have to refund the fees. And the presumption, by the way, is that the successful plaintiff does get their money back, not that they ruin someone else's day by forcing the state government to kind of track down other people to impose disfavored treatment. And the total amount, though, that you're saying Congress would want to sacrifice for this is $324 million, and you think that's what Congress would want to do? The government has said there's $324 million at stake. We actually don't know. We haven't seen the citation that supports that. What we do know is that the balance in the U.S. trustee fund right now I think could probably cover the full refunds, which just means that the money would go back to the people who were wrongly told to pay it, in which case I do think that that's a pretty fair solution for this problem. And then picking up on Justice Kagan's question, the government in its last footnote, footnote seven, says basically punt this to the judicial conference and let them sort out trying to in essence call back some of the fees where that's still possible. Suppose that is possible in some cases, but not all cases. Then what? This court has said that the remedy doesn't have to be strictly perfect. You can't have a situation where they earnestly try and they do a really good job and collect 98 percent of the fees, but the 2 percent that's remaining then ends up blowing up the whole system. But I think you would have to look and say, is this a good, could through a good faith effort of truly trying to call back all the fees, is that something the government could realistically do? And I think it's notable that the government sort of tepidly suggests this is even a possible solution. Their main arguments are that it's perfectly fine to correct problems going forward and to leave the non-uniform treatment in place in the past. And I think that's a pretty telling indication of the government speaking out of its own self-interest and not in a manner that actually remedies a constitutional wrong. Last quick question, do you accept Morales-Santana as the appropriate inquiry? Yes and no, Your Honor. Yes, in the sense that you do ask how would Congress want to fix unequal treatment. No, in that Morales-Santana was looking for prospective relief only. So it's a much easier case. We're only talking about retrospective, backward-looking relief. Thank you. Counsel, may I? Just one question. Counsel, on this issue, does the point at which you object make any difference? Meaning, you paid this fee for a year. You then went in and objected and asked the court below to stay your pay. I don't know how many other debtors did that. Does that enter into this calculus of the $324 million? I mean, I'm assuming some debtors' cases have been closed and they've paid the fee. Why should they now, why should we upset that apple cart? And the court may not have to. I mean, we're not a class action. We're an individual debtor action. We objected and we'd like the money back that we shouldn't pay. We're not saying the government can't assert waiver and forfeiture and oppose opening cases. Those are questions for those other debtors in those other cases. And they really don't affect the proper inquiry here. So if we said clawback, if we left it open for the court below to decide each case individually, why is that wrong? I think the court could try that. Now, just full candor, I do think that in terms of structuring the remedy of what would the legislature want, that's a question that debatably applies more on a global level. I agree. But yeah, I don't think there's anything that prevents this court from saying, we objected. We have fees that we would like back. We have an open case. And the proper constitutional remedy is to equalize the treatment by having us pay the lower fees. And any other debtor has to litigate on their own terms based on their own procedural posture. Very good. Justice Barrett? Just a very small clarification to an answer you gave, Justice Kagan. When she asked you about the analogy to the tax context, you said, well, because of federalism, the court is more deferential, but we can be more assertive here because we're in the federal system. Do we have to be more assertive here? And it seems attractive in a lot of the questions I've assumed that maybe it's best to let, assuming we agree with you on the merits, that it would be best to let either the lower courts or the judicial conference sort this out. Well, we hope you do agree with us on the merits. I think if the court would like to remand to the lower courts to sort out the remedy question, that's certainly an option. But what I was really trying to say, and just not as artfully as I should have, is that you don't have the added dynamic of a federal court instructing a state government about a state policy question. So that is at least removed and off the table. And I do think this court can look and apply the same framework as applied in the other cases and say, is this something that a rational legislative body would try to do? Again, especially in light of the congressional determination in 2020 not to do this and not impose retroactive fees when they easily could have. Thank you. Thank you, counsel. Thank you. Mr. Gannon? Mr. Chief Justice, and may it please the Court, over the past 35 years, quarterly fees paid by Chapter 11 debtors have sometimes differed across districts. But those differences did not violate the uniformity requirement of the Bankruptcy Clause, as illustrated by the wide variations in fees that were permitted under the first two bankruptcy acts enacted by Congress in 1800 and 1841. Such fees are either not subject to the uniformity requirement or their variation comports with what this Court has called the flexibility inherent in the constitutional provision. In any event, Congress acted to avoid any potential non-uniformity in 2000 by adopting the recommendation of the Judicial Conference to allow the six bankruptcy administrator districts to charge quarterly fees, quote, equal to those imposed, end quote, in the 88 U.S. trustee districts. As Justice Kavanaugh noted, in 2001, the Judicial Conference adopted a standing order directing payment of the quarterly fees in the statutory amounts, quote, as those amounts may be amended from time to time. When Congress amended those amounts in 2017, the failure of the bankruptcy administrator districts to implement them in time did not violate the uniformity requirement imposed on Congress, which asked for equal, not unequal, fees. But even if Congress had not requested equal fees, Congress was entitled to respond to a shortfall of funding in the U.S. trustee program by adopting a trustee-specific solution. And even if there were a constitutional violation because of different fees, the appropriate outcome would not be refunding the increased fees that Congress had required for the districts that accounted for 97 percent of the Chapter 11 filings, but an invalidation of the narrow exception for the bankruptcy administrator districts, which Congress has already enacted. That's consistent with this Court's cases about federal remedies in this context. I welcome the Court's questions. Mr. Gannon, would you – do you think the system is uniform to the extent that you have two different – you have the trustee system and the administrator system that are quite different, without getting into the fee structure? Well, the only – as Petitioner's Counsel noted, the only difference that anyone has asserted that made a difference to any debtor or creditor is the fees. There are two different programs. There have been two different programs, in a sense, since 1978, when the pilot program was initiated. And then the U.S. trustee program went almost nationwide in 1986 with the six-district carve-out. And so since then, there have been two programs. And my friend says that that's on the basis of politics and regionalism. But with respect, I would say that in the bankruptcy administrator system in the six districts where it existed, and the National Bankruptcy Review Commission recommended not to abolish that separate program, that there was a recognition that there were still these two established ways of going about administering those aspects of bankruptcy procedure. And so they are different programs, but we don't think that that difference in administrative assistance to the way the bankruptcy system operates is covered by the uniformity requirements because it is essentially procedural. So what would you consider a subject of bankruptcies that is not procedural? Well, as my friend said, the court has acknowledged that this clause is incapable of final definition, but it has always focused on the relations between the debtor and creditors and things like laws that allow – that cause the debtor's property to be distributed among creditors, as we call these the substantive rules of bankruptcy. Well, let's just take that. I think the argument would be that in this case, the fees, the amounts that are now going to pay fees would have been distributed to the extent there were distributions to creditors. Not every law that will have an effect on how much money is left in the pot at the end of the bankruptcy for distribution to creditors can be a law on the subject of bankruptcies. We know that because there are other procedural things that would affect how much money is there. If Congress made changes to federal tax law or employee benefit programs, that would affect priority of claims, the order that claims would get paid. If a bankruptcy court withdraws the reference in an individual case so that it doesn't – a district court withdraws the reference in an individual case so it doesn't start in bankruptcy court, there's one less set of appellate filing fees that will have to get paid. If somebody wants to appeal to the court of appeals, they won't have to go through the bankruptcy – from the bankruptcy court to the district court or through a bankruptcy appellate panel before they get to the court of appeals. There are other ways. The state exemption law that the court upheld in Moises varies state by state. That affects how much money is going to be available in the pot. Nobody thinks that those are laws on the subject of bankruptcies that can't be changed in a way that is covered by the – that those aren't covered by the uniformity requirement. But this is a top-down imposition of a fee structure that predictably can't help but disadvantage both debtors and creditors in two states – in 48 states as compared to two states. Now, you know, why – bankruptcies are going to be different in those 48 states and they're going to be different by virtue of a congressional decision that's directly related to bankruptcy. And I think the same thing was true under the 1800 and 1841 acts where every district was authorized to set fees at whatever it wanted to set. I don't think so. At first, your brief – I read your brief and I thought, oh, that's pretty convincing. And then it turns out it's not so convincing just because, you know, everybody had that choice and they made a choice. So this is Congress making the choice for 48 states and only giving the choice to two states. Well, we also think that Congress then told the Judicial Conference it could authorize equal fees and the Judicial Conference, which had asked for that authority and received that authority, had implemented that authority, and Congress was acting against that backdrop when it enacted this fee increase after the Judicial Conference had said it would stay in tune and had indeed done so in 2007. And so – and with respect to this question of the equal choice, my friend keeps saying that as long as the rule gives everyone equal choice, that's uniform. I don't think that makes sense for three reasons. First, dealer's choice is a really peculiar definition of uniformity and it violates his lead premise. It's not peculiar if what you're worried about is regional bias. Except it is inconsistent with his premise that indistinguishable debtors should not pay different fees because their bankruptcies arise in different states. And second, letting each district choose can't be the standard that we would be using for substantive rules of bankruptcy. We wouldn't use that for who can be a debtor, what is the estate, what is the scope of a discharge, and those are all different from the procedural questions the petitioner is trying to pick off with this particular argument. And third, I would say that this rule is just upside down, that it makes no sense to say that tolerating greater variations in every district and among every district would be more constitutionally uniform. Well, again, I guess I don't see that point if what you're worried about is regional bias. If what you're worried about is regional bias, then the idea of Congress picking select states for any purpose becomes something that's right in the heartland of what you're worried about. Well, it would if you thought that the uniformity requirement applied to this particular type of rule, and we do have the argument that says that we don't think that this is a substantive rule of bankruptcy, even though it can have an effect on how much money is left in the pot and a predictable effect. And that's true for lots of other laws that nobody thinks are substantive laws of bankruptcy or laws on the subject of bankruptcies. As I said, like, what are your federal tax obligations? What is an employee benefit that you have? And those all have predictable effects on what's going to happen in the bankruptcy, but nobody thinks Congress is legislating about bankruptcy when it amends ERISA. And then we also have two other arguments. One is that this was still equal. And third, that there's a separate clause, the inferior courts clause, that would be applicable here. And finally, that to the extent that you take as the background that there are two programs that had been in existence for 31 years at the request of the judicial conference, and you were able to legislate against that backdrop, then it's appropriate, as you and others said during my friend's argument, assuming that Congress can rationally solve the shortfall. And that is solving a geographically isolated problem, which this court recognized in Gibbons and in the regional railroad reorganization cases is something that the uniformity clause allows it to do. Mr. Cannon, those examples that you give of, say, ERISA, or what are your federal tax obligations, those aren't plausible exercises of the bankruptcy power, right? They are not. I mean, they could be to the extent that they have predictable effects on bankruptcy. If I understand my friend to say that if this is going to affect how much money there is here, that's a law on the subject of bankruptcy. And our argument is that there are things that Congress legislates with respect to the bankruptcy system that are definitely laws on the subject of bankruptcies. The substantive rules of bankruptcy, those are all subject to the uniformity requirement. There are other things Congress has the power to do, either as necessary and proper to that, or as necessary and proper to saying, we've decided we're going to run bankruptcy through inferior courts. We're not going to have it go through an independent agency or some part of the executive branch. So facial uniformity, just to be sure I'm following this, the facial uniformity requirement applies in your view only to what you're describing as substantive bankruptcy regulations like priority for creditors? The rules that govern relations between creditors and debtors and things like distribution of the property of the estate, yes. Those are the substantive rules of bankruptcy and not procedural aspects that there have been lots of variations. And the idea that you can't have a pilot program in some districts to test out some procedure. Now, I don't think that somebody would say we're going to try out a new version of chapter 11.5 on a trial run in a handful of districts. But that means that your argument really, it's much more important to your argument to distinguish between core bankruptcy power, the substantive law of bankruptcy and bankruptcy administration than, you know, in response to Justice Kagan, you were talking about what I take to be the differences between formal and functional uniformity, saying that your argument really emphasizes the formality of a law that gives all regions a choice. You say, well, that undermines the point of bankruptcy. That's a funny view of uniformity because it would allow for a lot of disuniformity. But that functional view really doesn't matter if the uniformity requirement doesn't apply to so-called bankruptcy administration. Well, it would matter, I think, to my friend's attempt to distinguish the 1800 and 1841 acts and other procedural requirement, other procedural variations that happen under the bankruptcy code today, that there can be bankruptcy appellate panels, there can be referrals from district courts to bankruptcy judges. There are all sorts of different variations that occur. And those have all been understood, I think, as being not the substantive rules of bankruptcy and therefore not covered by the uniformity requirement. And I'm saying that this attempt to say, well, it's a uniform standard because everyone gets equal choice, I don't think can be the rule that the court would use as the uniformity standard for everything in bankruptcy because you would not tolerate that for something like who can be a debtor who files for bankruptcy. Well, let every district decide, not in an individual court in an individual case, but let each district decide what its rule for who can be a debtor who files a bankruptcy petition. There are a lot of things. I'm probably agreeing with you. But in Congress, there are going to be national pork week. And every state has their choice, but you're right, it's national pork week for everybody. Anyone want an exception? Anyone who wants an exception comes in and give them an exception. Okay. I don't really see the difference between saying may, at least it's applied to an awful lot of things that I've had experience with, and saying don't worry, everyone has to do it unless you want an exception, as long as Now, what worries me about applying that, what I think is how things work to this is maybe this is done by the judicial conference, and maybe that makes it different. Well, we do think here that it matters that we're dealing with multiple statutes. Congress initially created the two different programs. I understand, but I mean, with the judicial conference, I mean, I've been in a number of bodies which do decide things that way. Sure, I'll skip the name of what they were. But does the judicial conference sometimes work that way? We want a rule here. Oh, anybody wants an exception to procedural rule, you want an exception, say so. If not, you're going to be stuck with the general rule. If it's well represented, they'll say so. Well, and just I don't know if that works that way in the judicial conference or not. Well, I mean, I think here, my friend points out that the choice here was Congress's. But I think you're making the point that at the time when the pilot program finished, Congress was looking at the evidence that it had about how successful the pilot program was, and it heard from representatives from two states, one of which had participated in the pilot program and didn't like it. The bench in the bar said that we prefer not to be subject to the U.S. trustees, and Congress deferred to that choice, at least for a temporary period, and also did that for another district. My friend says as long as Congress would have left that option open for every district in perpetuity, that would be fine. I think effectively what Congress did was said, well, you know, we've looked who doesn't want to join now, and we've concluded that there can be these two different programs, and that will be fine. And by the time the Ninth Circuit ruled in the mid-1990s that there was a potential uniformity problem with that, the judicial conference was defending the existence of the two programs and Congress... Let me give you a hypothetical, and it's just going to be a single statute, so you'll have to save your two-statute argument. But it's a single statute, and it says we're going to pick four states, and they just so happen to be the states of, you know, the chair and the ranking member of the relevant committees in the House and the Senate. We're going to pick those four states, and we're going to give them a system in which, you know, fees are a tenth of what they are everywhere else. So if you're a debtor, if you're a creditor in those four states, it's a very, very large difference in terms of how the bankruptcy estate comes out and how it gets divided up. Would that be appropriate? Well, I think that to the extent that fees aren't included in the uniformity requirement, it wouldn't be a uniformity violation. If it's an irrational change, then maybe it's subject to some... Well, I just gave you the hypothetical. Yes. They pick these four states for political reasons, nothing to do with any geographical conditions on the ground. And our first argument is that to the extent that it's just about fees, that that is not subject to the uniformity requirement, that is a procedural thing that isn't covered by the uniformity requirement. Congress can make distinctions. Even though every creditor and every debtor would rather be in these four states. To the extent that this is a geographic distinction that you think would be covered by the uniformity clause, then we think the question would be whether that is a rational geographical distinction. And that's what the court allowed in Givens and the Regional Railroad Reorganization Act cases. Well, so far you haven't really given a reason why this is rational. This is rational if you take as given that there are two programs because they had existed for three decades at the time the fee increase was enacted. And I don't think that Congress couldn't rely... But that's the two statute argument. Understood. But the two statute argument is, that seems peculiar, that you couldn't do it in one statute but you can kind of divide it up so that you can circumvent any uniformity limitation. If Petitioner had preserved the challenge to the underlying system, the two programs, and they were done at the same time and there was therefore no other justification Congress would have other than the fact that it wanted to exempt six districts, then I think it would be susceptible to that argument. But there were no Article III injuries to test that. Remember he said it wasn't clear that anybody could have challenged the initial division because it's not clear that any... Well, actually that's not true because there was a challenge because there were no fees in the bankruptcy administrator districts until 2002. Congress had to authorize the precisely to avoid this potential constitutional challenge. The Ninth Circuit had sustained a challenge in 19... I thought earlier you said that there was no constitutional injury between the two systems but for the difference in fees. That's correct. And I'm saying in response to Justice Barrett that there was a difference in fees. But it's the difference in fees that creates the injury. Between 1986 and 2001 and then again for the 13 quarter period that got stranded by the delay in implementation after the 2017 Act. I've got a different question for you on remedies. We have two options here remedially for backward looking relief and let's confine ourselves to that discussion for a moment. Clawback or refunds. On the clawback argument, your friend on the other side says well there may be a legal problem, a constitutional problem, retroactive lawmaking which is subject to heightened scrutiny in this court. The second is just a practical problem that a lot of these cases are closed. And then on the other side he says for purposes of refunds it's just going to be limited to the people who have actually made a complaint. As Justice Sotomayor pointed out you've got to file a complaint to get your money. And so it may not be that much. And we don't know where your figure of 300 some odd million dollars comes from. Would you care to address those points? Sure. I do think to the extent that he acknowledges that somebody, some people might not be able to claim their refund or might not claim their refund at this point, that proves that that's not going to be a complete equalization remedy retrospectively either. Well he's supposed to complain. That's true. But to the extent that the argument here I mean if he doesn't file a lawsuit for an injury, that doesn't work. So let's move on. But the $324 million figure is calculated by figuring out which debtors in the U.S. trustee program districts paid the heightened fee that was associated with at least a million dollars of disbursements in a quarter for any of the 13 quarters in which there was a disparity. It's the whole universe. It could be up to $300 million. It would be up to $324 million. But do we have any sense of what it actually would be? Well I think... The number of complaints? There is a case pending in the Federal Circuit that was filed as a class action. It wasn't certified as a class. That would be an opt-in class. I don't know. I don't have an actual number on what it would be. But to go back to your opening assumption here that if you look retrospectively there are only two remedies, a refund or a clawback, I'd say two other things. First, could you address the problems with the clawback approach that your colleague has addressed, the legal and the practical ones? Yeah, I would say that there could be a clawback remedy in the sense that if this court were to say, and we think the order of operations is the opposite of what Petitioner's Counsel says. We think that the first question the court needs to be asking here is what would Congress have wanted to do here? My question to Mr. Gannon, you know, there are two problems with the clawback. I'm going to keep repeating until you answer it. Okay? There are two problems with the clawback that your colleague has identified. One is legal and the other is practical. Could you address those? And then you can say whatever the heck else you want to say. I mean, the legal problem he says there might be some due process type concerns that would prevent somebody from being charged, from having to pay this fee after the fact. And I would say perhaps that is true. And that was also true in the other federal cases where we think that there was effectively no retrospective remedy in a circumstance that is like this. And therefore, that's not obviously a legal problem that would prevent the court from rejecting clawback as a remedy. And then, so practically speaking, I don't know. We think that McKesson shows us that there doesn't have to be a perfect effort, as does even Petitioner's proposed refund remedy. And we also think that here Petitioner had a pre-deprivation remedy. He challenged this rule. Can I just interrupt, though, on the legal point? As I understand it, you say yes, there probably or there might well be a due process problem here with retroactive legislation, but that doesn't eliminate clawback as a potential remedy. Is that the gist of the argument? The gist of the argument is, Justice Gorsuch, that the three most analogous cases I have are instances where there was effectively no retrospective equalization when the court was fixing a mistake like this, a disparate treatment problem, when it recognized that the remedy, the proper remedy, was to eliminate the exception that had given a minority of beneficiaries greater benefits. And so one example is Morales. But what incentive does the litigant have to bring a constitutional complaint if there's no possibility of retrospective relief? Well, that happens every time somebody brings a disparate treatment claim and the court concludes that the way we're going to equalize the disparate treatment is by eliminating the exception where somebody else was getting a benefit that the plaintiff is seeking and doesn't get. That's what happened in Morales-Santana, where the petitioner was saying, I should be made a U.S. citizen because my father was discriminated against. And the court said, no, you don't get citizenship even though you are a prevailing party in an equal protection case. You proved that the statute was unconstitutional. And the court invalidated the more generous exception there rather than the more restrictive rule, but it then did not do anything to operationalize that retrospectively. It did not go back and say everybody who had benefited from the exception has to give their citizenship back. Similarly, in the American Association of Political Consultants case, the court's remedy there was to invalidate the exception for government debt collection, robocalls. But the plurality's opinion specified in footnote 12 that those who had violated the general prohibition that was in place on robocalls would still remain liable and also acknowledge that notice concerns would prevent those who had been complying with the government debt collection exception, which was now invalidated, they would not be on the hook because of notice concerns. But that didn't cause the plurality to say that the remedy would be to say that that means we have to let everyone else off the hook under the majority rule. Well, one thing we didn't say is because of that, because of the prospect that you might not actually get anything, that you don't have a case and that we don't go and reach the merits of your case. It just leaves you the option of deciding how you want to go about equalizing the violation that the other side has shown. And you'd say what you, I don't mean to, I'd be surprised if the government thought it could go and claw back from all the other debtors the fees that, claw back rather than equalized by giving back the fees. But in any event, a lot of the examples you gave of things that you could have disuniformity, I don't mean to beg the question, but disparate treatment between a particular thing and that's not a violation. My example about the computer purchases, that's not a violation. It seems to me that what might make this case different is that you're dealing with cold hard cash and that is a big deal in bankruptcy. It doesn't matter what kind of computers you're using. But that's a significant factor. And if you have a choice as a debtor, where do you want to file for bankruptcy, you'd lose a lot of your, a lot of what is at stake paying fees that are how many times greater in the 48 than in the two? For this, it only covered the debtors who are paying more than a million dollars in disbursements. It could be up to seven times greater, seven plus times greater. Right, well that makes a big difference if you're running out of money, right? Yes. And that's different than the sort of procedural examples I think that you gave. With the differences in those situations, I don't think somebody would care whether they're, you know, one type of computer or, you know, that was my example, which may not be a very good one, one type of computer or another. But as you were going through examples, you could have this, you know, disuniform, disparate treatment. It struck me that that really wouldn't make a difference to the debtor or creditor, but this example might. Well, the truth is that for most of the time, the fees were actually equal and Congress expected them to be equal here. But I think to the extent, I'm not sure whether you mean this question to be part of the remedial questioning. I was not trying to contest that somebody would lack standing to bring such a challenge if the remedy at the end of the case ends up being that the other guy loses the benefit that I'm claiming that I should be able to get here. Not as part of the remedy, but as part of whether or not it violates the constitutional provision. If what is not treated the same way really makes a difference to people in bankruptcy. I take the point that it may make a difference and that money matters in a bankruptcy proceeding. But I mentioned that there are lots of other provisions of law that will affect how much money is available for distribution in the bankruptcy at the end. And we don't think that those are covered by the uniformity requirement. And also, to the extent that there are the two different programs and Congress has decided that one of them should be self-funded, then that is itself another rule that deserves respect here. And I would also observe with respect to the self-funding point that the bankruptcy administrator program fees, when they are being collected, also offset congressional appropriations. So this isn't an instance where one program is completely self-funding, the other one is completely taxpayer-supported. But it's one where because the judiciary and the bankruptcy administrator program have additional funding streams, Congress didn't have to worry about the shortfall when it was enacting this particular fee increase in 2017. But if I could go back and just add one other case to my answer for Justice Gorsuch about the remedial situations, one of them did involve money and it involved this issue. When the Ninth Circuit invalidated the two programs in the 1990s, it said the reason that it was unconstitutional is because of the fee disparity. And they said, so you are right, you are complaining that you should not have to pay this fee because some people in some other state wouldn't have to pay the fee. And the Ninth Circuit said, that's a violation of the uniformity requirement. The fix is to carve out the exception. We know Congress would actually want to have the U.S. trustee program. We're not going to flip everything upside down and substitute the 3% for the 97%. We're just going to take the 97% and pull it across. And at that point then, the Ninth Circuit's remedy was to say, pay the fee. You have to pay the entire fee because we severed the exception. And so we think that those are the cases that are the analogous remedy here, which is why if the court were to conclude that there is a disparate treatment here that violates the uniformity clause, that the judgment should be that the statute is unconstitutional to that extent, but it's the exception that is invalid. The 2020 statute does not disagree with that at all because Congress did not order refunds. My friend says Congress only had a prospective remedy, but Congress pointedly did not give refunds to everyone who had overpaid under their theory. And then the effective remedy here is going to be effectively only prospective. Unless you insist that there needs to be some sort of collection, then we think that the Judicial Conference would do what it says on its notices, which is refer a claim. We may refer a claim for a debt to the United States to the Treasury for collection. And so there could well be a practical way in which those could be collected. Thank you, counsel. Just one more question on the remedy. The question on which we granted cert was whether the Bankruptcy Judgeship Act violates the uniformity requirement of the bankruptcy clause by increasing quarterly fees solely in U.S. trustee districts. Now, we could answer that question, yes or no, without dealing with any remedy question at all, right? I think you could. Okay. Thank you. Justice Thomas? Justice Beyer? Justice Sotomayor, anything further? Justice Kagan? A couple of questions. You had mentioned in your brief the Wynn case as well, the Maryland case. How is that relevant to the remedy question? We cited it for the proposition that there the court recognized that it was another one of these cases where there is disparate treatment and the plaintiff, even though he has established that the law in question was unconstitutional, it doesn't mean that the plaintiff may get any practical relief at the end of the day in the terms of getting the money back. Instead, the fix might be that there is no longer going to be discriminatory treatment because the other guy is going to no longer get the benefit. Then next, we've been acting as if the 2017 legislation was a deliberate congressional choice to further a pilot program that involved disparate treatment. At least that's been the supposition. But that's actually wrong. Congress in 2017 was operating on an assumption that we raise the fees in the one, they'll be raised in the other. And that turns out not to pass for several months, right, which creates the issue in this case. So when we rely on, you say, in response to Justice Kagan, Congress was experimenting, not in 2017 they weren't doing that. They thought it had to be uniform, I think, or thought it should be uniform. And that raises my question. In 2020, they then say in the text of the statute, longstanding intention of Congress of fee requirements remain consistent across all federal judicial districts. My questions there are, one, how longstanding do you think that was? And two, do you think that's a constitutionally informed statement that Congress made or a policy statement or both? I think it's both. We agree with you. This is a separate argument that doesn't require the court to get into the question of what is the scope of the uniformity clause, whether this is a geographically isolated problem that's being legitimately dealt with. It's a completely separate argument that we think that the 2017 statute required equal fees. And it's not an argument that says may equals shall. It's an argument that says if you look at everything Congress has done in this space, going back to the 2000 law, when Congress first said may, it was responding to a request from the judicial conference because it was solving the problem identified in the Ninth Circuit case from the 1990s, a potential uniformity clause violation, uniformity requirement violation based on the fee differential. The judicial conference said, well, let us charge the same fees and there won't be a uniformity problem. Congress enacted a statute that said the judicial conference may impose equal fees. That was the word that was used. Equal fees. The judicial conference adopted a standing order that said we will charge the fees in the statute as it is amended from time to time. A fee increase happened in 2007 and it was ported across to the six districts and the bankruptcy administrator districts without incident. And so in 2017, when Congress amended a six again, it had every expectation that the judicial conference would indeed have a standing order take effect. The question, what do we make of all that for the constitutional issues that I mean, it's not a deliberate congressional choice in 2017. It's kind of a fallout. Right. And I don't know what which way that cuts. You want to give me seconds on which way you think that cuts. I mean, I think that it means that Congress thought that the statute would have equal fees across all 50 states. That was its intention. And in 2020, when it says this has always been our intention, we know that because the only reason it authorized these fees was to avoid the uniformity problem if there would be one. And therefore, it wouldn't have done that if it allowed unequal fees. And so all along, the purpose of a seven was to allow was to allow the judiciary to take steps to avoid the uniformity problem. And I think that that's constitutionally significant because it means that Congress was not legislating a non-uniform outcome here. It fully expected that as in 2007, the 2017 fee increase would be implemented without a delay. Justice Barrett. Thank you, counsel. Mr. Geiser, rebuttal. Thank you, Mr. Chief Justice. My friend talks a lot about what Congress intended and expected and might have hoped. But this court normally looks at what Congress actually wrote in the statute. And my friend says that may doesn't mean shall. It doesn't. And in fact, Congress used the word may in contrast to the word shall in the very interlocking provision that they were dealing with and then followed it up in a seven with the next sentence. It uses the word shall twice. This court doesn't presume that Congress uses different words in the same statute because it thinks they mean the same thing. So I think it's very clear, and especially when the judicial conference is telling Congress we have discretion to implement this or not. That means that if Congress wants to eliminate that discretion and secure uniformity, they have to do it on the face of the statute. My friend suggests that this is not a law on the subject of bankruptcy because the Constitution draws a distinction between substantive rules and procedural rules. I don't see that anywhere in the text of the The distinction, too, between substance and procedure is notoriously difficult to draw. I think the court normally tries not to get into that thicket unless it's unavoidable. I think it's odd to suggest that as a constitutional matter, the restraint on Congress's power should be invited through this incredibly difficult line to police. My friend suggests that we're wrong, that the Constitution requires uniform laws on the subject of bankruptcy, and it's strange to think that Congress or the Constitution would tolerate deviations at the local level. This court has already explained why the government is wrong in Moises. The court said that Congress can adopt varying state exemptions without running afoul of the uniformity context as long as the choice to the states is the same. It can have disparate local effects that has no difference on the And my friend suggests that the court, in looking at the exemptions for the dual system, the court should take into account this sort of shadow lawmaking that goes on behind the scenes of what states asked for exemptions from the program and which states didn't. That's not the way this court construes statutes. You look at the law that Congress passed, not what political forces went into the law to sort of rewrite the terms that Congress actually chose. For clawback as a remedy, I think that the Chief Justice is exactly right, that it would be surprising for Congress to say, let's go and find every creditor, professional, administrator that was involved in any of these closed cases, track them down, and try to get them to pay their pro rata share of the fee, which is what Congress would have to do to actually equalize the treatment. I think that, as Justice Gorsuch pointed out, there is a serious due process problem, which my friend, much of a friend, acknowledges. I think instead of resolving one series of constitutional litigation, that's a remedy that just invites a whole other series of constitutional questions and brand new litigation over a fee statute that was plainly non-uniform on its face. Unless the court has further questions. Thank you, Counsel. The case is submitted.